**Slip Op. 20-85**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**NEXTEEL CO., LTD.,**

**Plaintiff,**

**HYUNDAI STEEL COMPANY, HUSTEEL CO., LTD., AJU BESTEEL CO., LTD., MAVERICK TUBE CORP., and SEAH STEEL CORP.,**

**Consolidated Plaintiffs,**

**and**

**HUSTEEL CO., LTD., HYUNDAI STEEL CO., and ILJIN STEEL CORP.,**

**Plaintiff-Intervenors,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**IPSCO TUBULARS INC., VALLOUREC STAR, L.P., WELDED TUBE USA INC., MAVERICK TUBE CORP., and UNITED STATES STEEL CORP.,**

**Defendant-Intervenors.**

**Before: Jennifer Choe-Groves, Judge**

**Consol. Ct. No. 17-00091**

**OPINION**

[Sustaining the United States Department of Commerce's remand redetermination following an administrative review of the antidumping order on oil country tubular goods from the Republic of Korea. Denying Plaintiff's motion for entry of partial final judgment as moot.]

Dated: June 17, 2020

J. David Park, Michael T. Shor, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, and Kang Woo Lee, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Plaintiff NEXTEEL Co., Ltd. and Consolidated Plaintiff and Plaintiff-Intervenor Hyundai Steel Company.

Donald B. Cameron, Eugene Degnan, Brady W. Mills, Julie C. Mendoza, Mary S. Hodgins, and Rudi W. Planert, Morris, Manning, & Martin, LLP, of Washington, D.C., for Consolidated Plaintiff and Plaintiff-Intervenor Husteel Co., Ltd. Jordan L. Fleischer and Edward J. Thomas III also appeared.

Jarrod M. Goldfeder and Robert G. Gosselink, Trade Pacific, PLLC, of Washington, D.C., for Consolidated Plaintiff AJU Besteel Co., Ltd.

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon, White & Case LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor Maverick Tube Corporation and Defendant-Intervenor IPSCO Tubulars Inc.[1] Luca Bertazzo also appeared.

Jeffrey M. Winton and Amrietha Nellan, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff SeAH Steel Corporation.[2]

Roger B. Schagrin, Elizabeth J. Drake, and Christopher T. Cloutier, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors Vallourec Star, L.P. and Welded Tube USA Inc. Paul W. Jameson also appeared.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Hardeep K. Josan, Attorney, United States Department of Justice, of New York, N.Y., for Defendant United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Mykhaylo A. Gryzlov, Senior Counsel, United States Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance, of Washington, D.C.

Joel D. Kaufman and Richard O. Cunningham, Steptoe & Johnson LLP, of Washington, D.C., for Plaintiff-Intervenor ILJIN Steel Corporation.

---

[1] Counsel for IPSCO Tubulars Inc. advised that the entity formerly known as TMK IPSCO, which had been represented by Schagrin Associates, is now known as IPSCO Tubulars Inc. Letter Regarding Acquisition And Party Name, Feb. 7, 2020, ECF No. 202. IPSCO Tubulars Inc. is represented by White & Case LLP. Notice of Substitution of Attorney, Feb. 7, 2020, ECF No. 199. The caption is amended accordingly.

[2] The law firm formerly known as the Law Office of Jeffrey M. Winton PLLC is now known as Winton & Chapman PLLC. Amended Notice of Appearance, Jan. 14, 2020, ECF Nos. 193–94.

Choe-Groves, Judge: This action arises from the administrative review of the antidumping order on oil country tubular goods ("OCTG") from the Republic of Korea ("Korea") by the United States Department of Commerce ("Commerce"). See Certain Oil Country Tubular Goods from the Republic of Korea, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of antidumping duty administrative review; 2014–2015), as amended, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) (amended final results of antidumping duty administrative review; 2014–2015) ("Final Results"); see also Certain Oil Country Tubular Goods from the Republic of Korea, 81 Fed. Reg. 71,074 (Dep't Commerce Oct. 14, 2016) (preliminary results of the antidumping duty administrative review; 2014–2015) ("Preliminary Results"). Before the court are the second Final Results of Redetermination Pursuant to Court Remand, Nov. 20, 2019, ECF No. 190-1 ("Second Remand Redetermination"), pursuant to the court's decision in NEXTEEL Co., Ltd. v. United States, 43 CIT __, __, 399 F. Supp. 3d. 1353, 1355 (2019) ("NEXTEEL III"). For the reasons set forth in this opinion ("NEXTEEL IV"), the court sustains the Second Remand Redetermination.

**PROCEDURAL HISTORY**

The court presumes familiarity with the facts of this case. See NEXTEEL Co. Ltd. v. United States, 43 CIT __, __, 355 F. Supp. 3d 1336, 1344–52, 1357–58, 1360–61 (2019) ("NEXTEEL I"). In NEXTEEL I, the court considered seven Rule 56.2 motions for judgment on the agency record and fourteen issues presented by the Parties. See id. at 1343–44. The court sustained in part and remanded in part Commerce's Final Results. Id. at 1344, 1364. Consolidated Plaintiff SeAH Steel Corporation ("SeAH") and Defendant-Intervenors Maverick Tube Corporation ("Maverick"), IPSCO Tubulars Inc. (then known as TMK IPSCO), Vallourec Star, L.P., Welded Tube USA, and United States Steel Corporation filed motions for

reconsideration of the court's decision in NEXTEEL I as to SeAH's ocean freight expenses, Commerce's application of differential pricing analysis, and the particular market situation adjustment. See NEXTEEL Co. Ltd. v. United States, 43 CIT __, __, 389 F. Supp. 3d 1343, 1346–47 (2019) ("NEXTEEL II"). The court denied both motions for reconsideration. Id. at 1350. In NEXTEEL III, the court sustained in part and remanded in part Commerce's first remand redetermination ("First Remand Redetermination"). NEXTEEL III, 399 F. Supp. 3d at 1362.

Commerce filed its Second Remand Redetermination on November 20, 2019. SeAH filed comments. Comments of SeAH Steel Corp. on Commerce's Nov. 20, 2019 Redetermination, Dec. 20, 2019, ECF No. 192 ("SeAH's Comments"). Defendant United States and Defendant-Intervenor Maverick responded. Def.'s Resp. to Comments Regarding the Remand Redetermination, Jan. 21, 2020, ECF No. 195 ("Def.'s Resp."); Responsive Comments of Def.-Inter. Maverick Tube Corp. in Supp. of Commerce's Remand Redetermination, Jan. 21, 2020, ECF No. 196 ("Def.-Inter.'s Resp."). SeAH filed the Joint Appendix. Public Joint Appendix Second Remand Redetermination, Jan. 27, 2020, ECF No. 198.

Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL") moved for entry of partial final judgment under CIT Rule 54(b). Mot. for Entry of Partial Final J. With Respect to NEXTEEL's Claims, Feb. 10, 2020, ECF No. 207 ("NEXTEEL's 54(b) Mot."). Defendant United States responded. Def.'s Resp. to NEXTEEL's Mot. For Entry of Partial Final J., Mar. 23, 2020, ECF No. 211. Defendant-Intervenors responded. Def.-Inters.' Resp. to NEXTEEL's Mot. For Entry of Partial J., Mar. 16, 2020, ECF No. 210. NEXTEEL replied. Reply to Def.'s and Def.-Inters.' Resps. to NEXTEEL's Mot. for Entry of Partial Final J., Apr. 13, 2020, ECF No. 215.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which provide the court with authority to review actions contesting the final results of an administrative review of an antidumping duty order. The court will uphold Commerce's determinations, findings, or conclusions unless they are unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## ANALYSIS

### I. Treatment of Pusan Pipe America Inc.'s General and Administrative Expenses as Indirect Selling Expenses

In the Final Results, Commerce deducted general and administrative ("G&A") expenses from constructed export price for resold United States products for SeAH's United States affiliate, Pusan Pipe America Inc. ("PPA"). See First Remand Redetermination at 11–12; Final Issues & Decision Memorandum, P.R. 551 (Apr. 10, 2017) at 6, 87–88 ("Final IDM"). Commerce explained that "[b]ecause PPA's G&A activities support the general activities of the company as a whole, including its sales and further manufacturing functions of all products," Commerce applied the "G&A ratio to the total cost of further manufactured products . . . as well as to the cost of all resold products." Final IDM at 87–88. The court noted that Commerce's explanation failed to clarify why it deducted PPA's G&A expenses for resold products or how Commerce determined that it would apply all of PPA's G&A expenses to resold products. NEXTEEL I, 355 F. Supp. 3d. at 1360–61. The court concluded that Commerce's decision to deduct G&A expenses in the Final Results was unsupported by substantial record evidence and remanded this issue for clarification or reconsideration of Commerce's methodology. Id. at 1361.

In the First Remand Redetermination, Commerce explained that "Commerce did not apply 'all' of PPA G&A expenses to directly resold products" and "Commerce allocated PPA G&A expenses proportionally to all of the products PPA sold (i.e., products which PPA directly resold and products PPA further processed and then resold)." First Remand Redetermination at 11–12. For further manufactured products, Commerce "applied PPA's G&A expense ratio to the total cost of further manufacturing, plus the cost of production . . . of imported OCTG pipe that was further manufactured, and [Commerce] included the amount as further manufacturing under 19 U.S.C. § 1677a(d)(2)." Id. at 14. Commerce also "applied PPA's G&A expense ratio to the [cost of production] of the imported OCTG for products not further manufactured and included the amount as indirect selling expenses under 19 U.S.C. § 1677a(d)(1)(D)." Id. The court noted that Commerce's First Remand Redetermination did not identify what record evidence supported the treatment of G&A expenses as selling expenses or explain why Commerce may treat G&A expenses as selling expenses. NEXTEEL III, 399 F. Supp. 3d at 1361. The court remanded this issue again for further explanation of why Commerce may treat G&A expenses as selling expenses as to PPA and for identification of record evidence supporting its position. Id. at 1361–62.

In the Second Remand Redetermination, Commerce explained that PPA is SeAH's United States affiliate established for the purpose of generating sales in North America. Second Remand Redetermination at 5. Commerce noted that PPA has no production capabilities of its own, meaning the extent of PPA's further manufacturing costs is the fee PPA pays to unaffiliated processors. Id. at 5–6. Commerce decided to allocate "PPA's G&A expenses proportionately to all of the products PPA sold (*i.e.*, products which PPA directly resold and products which PPA further processed and then resold) as indirect selling expenses . . . ." Id. at 10.

An antidumping duty represents the amount by which the normal value of the merchandise exceeds its export price or constructed export price. 19 U.S.C. § 1673. Constructed export price is the price at which the subject merchandise is first sold in the United States by a seller affiliated with the producer or exporter to a non-affiliated purchaser. Id. § 1677a(b). When calculating constructed export price, Commerce must make adjustments for certain expenses. Id. § 1677a(b), (d). Under 19 U.S.C. § 1677a(d)(2), Commerce must reduce constructed export price by "the cost of any further manufacture or assembly (including additional material and labor) . . . ." Id. § 1677a(d)(2). Commerce also must reduce the constructed export price by:

> (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—
>
> (A) commissions for selling the subject merchandise in the United States;
>
> (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
>
> (C) any selling expenses that the seller pays on behalf of the purchaser; and
>
> (D) any selling expenses not deducted under subparagraph (A), (B), or (C).

Id. § 1677a(d)(1)(A)–(D). "For purposes of calculating indirect selling expenses, Commerce generally will include G&A expenses incurred by the United States selling arm of a foreign producer." Aramide Maatschappij V.o.F. v. United States, 19 CIT 1094, 1101 (1995) ("Aramide"). "[I]ndirect selling expenses . . . implicitly contemplate[] the exclusion of all expenses that relate to sales of non-subject merchandise, as well as the exclusion of . . . all expenses that are entirely unrelated to sales." United States Steel Corp. v. United States, 34 CIT 252, 266 (2010) (internal punctuation omitted). When the record shows that an expense is "unrelated to the sale of subject merchandise, that expense may be removed from the indirect

selling expense calculation." Id. (internal citation and punctuation omitted); see also Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 154 (1994) ("SAA") (describing "indirect selling expenses" in largely similar terms).[3]

SeAH argues that certain of its G&A expenses are properly described as manufacturing expenses. SeAH's Comments at 2–4. Defendant and Maverick counter that PPA is the United States selling arm of a foreign producer (SeAH), PPA's involvement in further manufacturing activities is perfunctory, and Commerce treated PPA's G&A expenses appropriately as indirect selling expenses. Def.'s Resp. at 4; Def.-Inter.'s Resp. at 4–6.

*i. Commerce's Conclusions That PPA is SeAH's United States Affiliate And Primarily Functions to Facilitate SeAH's Sales in North America Are Supported by Substantial Evidence*

The court first examines whether Commerce's conclusions that PPA is SeAH's United States affiliate and primarily functions to facilitate SeAH's sales in North America are supported by substantial evidence.

Commerce found that PPA is SeAH's United States affiliate, PPA was established to generate sales in North America, and PPA's primary function is to facilitate SeAH's sales. Second Remand Redetermination at 5. Commerce found that PPA has no production capabilities of its own and PPA's further manufacturing costs are limited to the fee PPA pays to unaffiliated processors tasked with the further processing of the products PPA sells. Id. at 5–6. The parties do not dispute that PPA is SeAH's United States affiliate, SeAH's Comments at 6, and that PPA neither owns nor operates its own manufacturing facilities, id. at 3. The record evidence supports Commerce's conclusion that PPA primarily facilitates SeAH's sales in North America.

---

[3] The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

See Second Remand Redetermination at 5 (noting that SeAH, in a questionnaire response, conceded that SeAH's two channels for sales of OCTG to United States customers are through its United States affiliate, PPA).[4] Based on the record evidence cited by Commerce, the court accepts as reasonable Commerce's conclusion that PPA's primary function is the facilitation of SeAH's sales in North America.

The court concludes that Commerce's findings that PPA is SeAH's United States affiliate and primarily functions to facilitate SeAH's sales in North America are supported by substantial evidence.

*ii. Commerce's Treatment of PPA's G&A Expenses as Indirect Selling Expenses is in Accordance With The Law*

The court next examines whether Commerce's treatment of PPA's G&A expenses as indirect selling expenses is in accordance with the law.

When calculating indirect selling expenses, Commerce generally includes G&A expenses incurred by the United States selling arm of a foreign producer. Aramide, 19 CIT at 1101. SeAH's argument that PPA engages in administrative activities relating to manufacturing is inapposite. SeAH's Comments at 3. Commerce found that PPA is the United States selling arm of a foreign producer, and the parties do not dispute that PPA neither owns nor operates its own

---

[4] See SeAH's Section A Supp. Questionnaire Resp. at Question 5, P.R. 225–227 (July 6, 2016). As SeAH explained, in pertinent part:

> [SeAH] sells OCTG to the United States to U.S. customers through two channels of distribution: (1) back-to-back sales through the head office of PPA, and (2) inventory sales through PPA's PMT division. A comparison of the reported sales and entry quantities for each of these distribution channels during the review period is provided in Appendix SA-1. For back-to-back sales, the OCTG is shipped directly by SeAH to the U.S. port of entry where PPA takes title to the merchandise. The OCTG is then shipped directly from the U.S. port to the U.S. destination designated by PPA's customer.

manufacturing facilities. Id.; Second Remand Redetermination at 5–6. To the extent that PPA purchases and supplies material inputs to contractors performing further manufacturing and tracks products through the manufacturing process, the associated G&A expenses are properly understood as expenses facilitating sales, not manufacturing. See SeAH's Comments at 3. Commerce accounted for G&A activities supporting further manufacturing in the fee PPA pays to the unaffiliated processors, whose further manufacturing activities can reasonably be expected to incur G&A expenses funded by PPA's fee. Commerce already treats that processing fee as a further manufacturing expense. Second Remand Redetermination at 8. Allocating a portion of PPA's G&A expenses to further manufacturing, as requested here by SeAH, would result in impermissible double counting.

The court concludes, therefore, that Commerce's treatment of PPA's G&A expenses as indirect selling expenses is in accordance with the law.

## II. Exhaustion of SeAH's Administrative Remedies

The court next considers whether SeAH exhausted its administrative remedies.

The court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "Absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." Boomerang Tube LLC v. United States, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Generally, exhaustion requires that a party submit an administrative case brief to Commerce presenting all arguments that continue to be relevant to Commerce's final determination or results. Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010); see 19 C.F.R. § 351.309(c)(2). If a party fails to put forth a relevant argument before Commerce in its case brief, then that argument is typically considered waived and will not

be considered by a court on appeal. DuPont Teijin Films China Ltd. v. United States, 38 CIT __, __, 7 F. Supp. 3d 1338, 1354 (2014) (citations omitted). Parties must raise their issues before Commerce at the time the agency addresses the issue because "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." Dorbest Ltd., 604 F.3d at 1375 (citing Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008) and United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)) (internal punctuation omitted).

*i. SeAH Did Not Exhaust Its Administrative Remedies And Waived Its Argument Concerning Inconsistent Questionnaire Instructions*

SeAH argues that Commerce's Second Remand Redetermination is inconsistent with questionnaire instructions SeAH received in a different proceeding. SeAH's Comments at 4–6. The Government argues that SeAH did not exhaust its administrative remedies because SeAH did not raise this argument properly before the agency. Def.'s Resp. at 6.

The brief that SeAH submitted in the remand administrative proceeding does not address the argument it now raises for the first time before this court. See SeAH's Comments on Draft Remand Determination 1–7, R.P.R. 6 (Nov. 4, 2019) ("SeAH's Comments on Draft Remand Determination"). SeAH had an opportunity during the remand administrative proceeding below to raise its argument in its case brief concerning inconsistencies between Commerce's draft of the Second Remand Redetermination and prior questionnaire instructions. Here, where the court remanded Commerce's G&A allocation methodology, Commerce's past practice relating to Commerce's allocation methodology was well within the scope of issues that SeAH should have addressed during the administrative proceeding on remand if it wished to litigate them before this court. Dorbest Ltd., 604 F.3d at 1375; see 19 C.F.R. § 351.309(c)(2); see DuPont Teijin Films China Ltd., 7 F. Supp. 3d at 1354 (holding that where a party had failed to make a particular

argument to Commerce, that party failed to exhaust its administrative remedies and so waived that argument). Neither the law nor the facts here describe a strong contrary reason for permitting SeAH to sidestep the requirement to exhaust its administrative remedies. Boomerang Tube, 856 F.3d at 912.

The court concludes that SeAH did not exhaust its administrative remedies as to SeAH's argument that Commerce's Second Remand Redetermination is inconsistent with questionnaire instructions SeAH received in a different proceeding because SeAH failed to address the issue during the remand administrative proceeding when it had an opportunity to express dissatisfaction with Commerce's actions. Because SeAH did not exhaust its administrative remedies, SeAH has waived this argument before the court. Accordingly, the court will not opine on this issue.

*ii. SeAH Did Not Exhaust Its Administrative Remedies And Waived Its Argument as to Whether SeAH Should be Granted a Constructed Export Price Offset*

The court next considers whether SeAH exhausted its administrative remedies and therefore waived its argument with respect to the issue of a constructed export price offset when SeAH did not raise the issue in its administrative case brief.

Although SeAH raised the constructed export price offset issue in the most recent remand administrative proceeding, the parties do not dispute that the case brief SeAH filed in the initial administrative proceeding did not raise the constructed export price offset issue. SeAH's Comments at 7; Second Remand Redetermination at 16; Def.-Inter.'s Resp. at 10–12. The question before the court is whether SeAH waived its argument when SeAH failed to address the constructed export price offset issue in its initial administrative case brief that would have served to express its dissatisfaction with Commerce's Preliminary Results before Commerce published the Final Results in 2017. The record demonstrates that SeAH was aware of the constructed

export price offset issue in 2016, prior to Commerce's issuance of the Preliminary Results and prior to SeAH's filing of its initial administrative case brief. SeAH's Comments at 6; SeAH's Section A Response, P.R. 121–22 (Mar. 18, 2016) at 24 ("SeAH's Section A Resp.") (demonstrating that SeAH knew about the constructed export price offset issue in 2016). After Commerce issued the Preliminary Results, SeAH failed to raise the constructed export price offset argument or otherwise express its dissatisfaction with this issue in SeAH's initial administrative case brief, and Commerce published its Final Results in 2017. SeAH's Comments at 7; Second Remand Redetermination at 16; Def.-Inter.'s Resp. at 10–12. SeAH raised the constructed export price offset issue in an administrative case brief for the first time in 2019, when SeAH asserted in its comments on the draft Second Remand Redetermination that Commerce's denial of a constructed export price offset was based on a faulty determination. SeAH's Comments on Draft Remand Determination at 5–7; see SeAH's Comments at 7. Maverick argues that SeAH did not exhaust its administrative remedies before Commerce as to the constructed export price offset issue, a constructed export price offset is inappropriate, and none of SeAH's expenses are equivalent to PPA's G&A expenses. Def.-Inter.'s Resp. at 10–15. Commerce has requested a voluntary remand for the purpose of reconsidering whether SeAH should be granted a constructed export price offset. Def.'s Resp. at 6, 8.

The court holds that SeAH failed to exhaust its administrative remedies and therefore waived its constructed export price offset argument before this court because (1) SeAH was aware of the constructed export price offset issue when it filed its questionnaire response in 2016, SeAH's Section A. Resp. at 24; (2) Commerce's Preliminary Analysis Memorandum did not include a level of trade adjustment or constructed export price offset for SeAH, Second Remand Redetermination at 16; (3) SeAH failed to raise the constructed export price offset

argument in the initial administrative case brief to express its dissatisfaction with Commerce's Preliminary Results prior to the publication of Commerce's Final Results in 2017, id.; and (4) SeAH challenged Commerce's denial of a constructed export price offset for the first time when SeAH filed its comments on the Second Remand Redetermination in 2019. SeAH's Comments at 7; Second Remand Redetermination at 16; see DuPont Teijin Films China Ltd., 7 F. Supp. 3d at 1354.

Because SeAH failed to address the constructed export price offset issue in its initial administrative case brief, the court concludes that SeAH did not exhaust its administrative remedies and, as a result, waived its argument before this court. Therefore, the court will not consider the constructed export price offset issue in this litigation. The court also denies Commerce's request for a voluntary remand because the constructed export price offset issue was waived.[5] In addition, because the court has rendered a conclusive determination as to the Second Remand Redetermination, the court denies as moot NEXTEEL's motion for entry of partial final judgment under CIT Rule 54(b). NEXTEEL's 54(b) Mot.

**CONCLUSION**

For the foregoing reasons, the court sustains Commerce's Second Remand Redetermination and denies NEXTEEL's Motion for Entry of Partial Final Judgment With Respect to NEXTEEL's Claims. Judgment will enter accordingly.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated: June 17, 2020
New York, New York

[5] The court notes that it has previously denied Commerce's impermissible request for a "do-over" in this matter. NEXTEEL I, 355 F. Supp. 3d at 1348.